# EXHIBIT A

In the matter of the Arbitration
- between -

Cook Inlet Spill Prevention & Response, Inc.
and CISPRI Services, LLC,
Claimants

- and -

Furie Operating Alaska LLC,
Respondent

**STIPULATION RE CONTRACTUAL ARRANGEMENT**

The Parties, through counsel, in response to the Arbitrator's Ruling of May 11, 2020, submit the following stipulation regarding the "contractual arrangements" relating to the charter of the PERSEVERANCE by Furie Operating Alaska LLC on January 8, 2016:

1. The correct underlying charter is the Uniform Time Charter of January 4, 2016 (see Exhibit 1);

2. The correct spot charter for the January 8, 2016 charter term does not exist as a single document. Rather, the correct spot charter is a combination of the form "Spot Charter" unsigned and without annotation, that is Schedule A to Uniform Time Charter (except for the vessel identified), attached hereto as Exhibit 2 to this stipulation, with the date of "01/04/2016" added in the "Underlying Charter" section and the box for "OSV/Spill Response – Full Day" checked in the "Type of Hire and Charges" section; and the following information from the "Spot Charter" of January 5, 2016 (Exhibit 3): "Charterer", "Identification of Vessel and Equipment," "Charter Term," and the rate from the "Hire and Charges" in the top section and the signatures and dates at the bottom of the form (specifically excluding the "Underlying Charter" section and paragraphs 1 – 4).

//
//

STIPULATION RE CONTRACTUAL
ARRANGEMENT - 1
Case No. 2:17-cv-00856-MJP

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
1325 FOURTH AVENUE, SUITE 1650
SEATTLE, WASHINGTON 98101
TEL: 206-838-7555
FAX: 206-838-7515

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

DATED: August 27, 2020

/s/ Chris P. Reilly
Chris P. Reilly, WSBA No. 25585, Alaska Bar No. 0807047
*Attorneys for Claimants*

DATED: August 27, 2020

/s/ Ken Hannam
Ken Hannam, Alaska Bar No.8310146
*Attorneys for Respondent*

PURSUANT TO STIPULATION, IT IS SO ORDERED

DATED: _____

_____
Richard Corwin
Arbitrator

STIPULATION RE CONTRACTUAL ARRANGEMENT - 2
Case No. 2:17-cv-00856-MJP

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
1325 FOURTH AVENUE, SUITE 1650
SEATTLE, WASHINGTON 98101
TEL: 206-838-7555

Case 3:21-cv-00194-SLG   Document 1-1   Filed 08/23/21   Page 3 of 18

**Exhibit 1**

# CISPRI SERVICES UNIFORM TIME CHARTER PARTY FOR
# OFF-SHORE SUPPLY AND SUPPORT SERVICES



This Time Charter Party for Off-Shore Supply and Support Services ("**Charter**") is entered into this 4th day of January, 2018, in Nikiski, Alaska, by and between CISPRI Services LLC, 51377 Kenai Spur Highway, Kenai, AK 99611 ("**CISPRI**" or "**OWNER**") and Furie Operating Alaska LLC ("**CHARTERER**") for the vessel and equipment identified in **Schedule A**, the Spot Charter Agreement ("**Spot Charter**"). The reference in this Charter to "vessel" will, in the case where more than one vessel is chartered, also refer to the other vessel or vessels.

1. **Delivery/Redelivery:**
   (a) (i) Delivery of the vessel and equipment will take place once the vessel pulls anchor and commences movement to the location requested by CHARTERER. Redelivery of the vessel and equipment will take place once the vessel(s) and equipment are returned to their original location in Nikiski, Alaska or a different location reasonably determined by CISPRI within the area of operation of the vessel as described in Clause 3, paragraph (b). The time between the delivery and redelivery of the vessel and equipment will be referred to as the "Charter Period." Any special requirements or conditions relating to the chartering of the vessel and, if applicable, the equipment, shall be as set forth in the Spot Charter between the parties which shall supplement the terms of this Charter Party. In the event of any conflict between this Charter and the Spot Charter, the terms of the Charter shall be controlling.
   (ii) Without prejudice to any claims for damages CHARTERER may have, if the vessel and equipment defined in Schedule A is not, or is not likely to be, ready and at the CHARTERER's disposal on the delivery date defined in Clause 5 (except for reasons of Force Majeure defined in Clause 22), CHARTERER shall have the option to terminate this Charter, upon notice to OWNER, without owing any compensation to OWNER. The parties agree that if OWNER is not able to deliver the vessel and equipment defined in Schedule A on the delivery date OWNER shall, if such other vessel and equipment are available and not being used in emergency spill response, be entitled to deliver a substitute vessel and equipment.
   (iii) The vessel and equipment shall be redelivered on the expiration or earlier termination of this Charter in the same condition as it was in when delivered, except for normal wear and tear. CHARTERER shall give not less than twenty four (24) hours written notice of its intention to redeliver the vessel and equipment.

2. **Condition of Vessel and Equipment:**
   (a) OWNER undertakes that at the date of delivery under this Charter the vessel and equipment shall be of the description and Class as specified in Schedule A, attached hereto, and in a thoroughly efficient state of hull and machinery.
   (b) OWNER shall exercise due diligence to maintain the vessel and equipment in such Class and in every way fit for the service stated in Clause 3 throughout Charter Period.

3. **Employment and Area of Operation:**
   (a) The vessel and equipment shall be employed in off-shore supply and support services in the Cook Inlet which are lawful in accordance with the laws of the State of Alaska and the United States. In the event of a spill or other environmental natural disaster in the Cook Inlet, the vessel and equipment shall be employed in spill response in the Cook Inlet.

   (b) Except as otherwise agreed by both parties, the vessel and equipment will not be permitted to perform any services outside the Cook Inlet, the geographical scope of its customary operating area, which is defined as the public and private properties, beaches, harbors, bays, estuaries and waters in the Cook Inlet watershed drainage, State of Alaska, and northward including the Matanuska River to the City of Palmer, the Susitna River and its tributaries. The southernmost boundary shall be defined as in 46 CFR 7.165(a): "A line drawn from the southernmost extremity of Kenai Peninsula at longitude 151 Deg. 44.0' W. to East Amatuli Island Light; thence to the northwestern most extremity of Shuyak Island at Party Cape; thence to the easternmost extremity of Cape Douglas."
   (c) The Vessel's Space. The whole reach and burden and decks of the vessel shall throughout the Charter Period be at the CHARTERER'S disposal reserving proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions, stores and CISPRI's required spill response equipment. The CHARTERER shall be entitled to carry, so far as space is available and for their purposes in connection with



its operations, persons other than crew members, other than fare paying, and for such purposes to make use of the vessel's available accommodation not being used on the voyage by the vessel's crew. The OWNER shall provide suitable provisions and requisites for such persons for which the CHARTERER shall pay $20.00 per meal and $50.00 per day/per person for the provision of bedding and services for persons using berth accommodation.

4. **Master and Crew**
   (a) (i) The master shall carry out his duties promptly and the vessel shall render all reasonable services within her capabilities by day and by night and at such times and on such schedules as the CHARTERER may reasonably require without any obligations of the CHARTERER to pay to the OWNER or the master, officers or the crew of the vessel any excess or overtime payments. The CHARTERER shall furnish the master with all instructions and sailing directions and the master and engineer shall keep full and correct logs accessible to the CHARTERER or its agents.
   (ii) (1) The master or designee shall sign cargo documents as applicable and as directed by the CHARTERER in the form of receipts that are non-negotiable documents and which are clearly marked as such.
   (2) The CHARTERER shall indemnify the OWNER against all liabilities that may arise from the signing of such cargo documents in accordance with the direction of the CHARTERER to the extent that the terms of such cargo documents impose more onerous liabilities than those assumed by the OWNER under the terms of this Charter.
   (b) The vessel's crew, if required by the CHARTERER, will connect and disconnect electric cables, fuel, water and pneumatic hoses when placed on board the vessel in port as well as alongside the offshore units; will operate the machinery on board the vessel for loading and unloading cargoes; and will hook and unhook cargo on board the vessel when loading or discharging alongside offshore units. If the port regulations or the seamen and/or labor unions do not permit the crew of the vessel to carry out any of this work, then the CHARTERER shall make, at its own expense, whatever other arrangements may be necessary, always under the direction of the master.
   (c) If the CHARTERER has reason to be dissatisfied with the conduct of the master or any officer or member of the crew, CHARTERER shall notify the OWNER, and the OWNER on receiving particulars of the complaint shall promptly investigate the matter and if the complaint proves to be well founded, the OWNER shall as soon as reasonably possible make appropriate changes in the appointment.
   (d) The entire operation, navigation, and management of the vessel shall be in the exclusive control and command of the OWNER, its master, officers and crew. The vessel will be operated and the services hereunder will be rendered as requested by the CHARTERER, subject always to the exclusive right of the OWNER or the master to determine whether operation of the vessel may be safely undertaken. In the performance of the Charter, the OWNER is deemed to be an independent contractor, the CHARTERER being concerned only with the results of the services performed.

5. **OWNER to Provide**
   (a) The OWNER shall provide and pay for all provisions, wages and all other expenses of the master, officers and crew; and all maintenance and repair of the vessel's hull, machinery and equipment. If the CHARTERER requests any extra crew or equipment to be provided during the period of the Charter, any extra labor, equipment or insurance expenses shall be for the CHARTERER'S account. Also, except as otherwise provided in this Charter, OWNER shall pay for all insurance on the vessel, all dues and charges directly related to the vessel's flag and/or registration, all deck, cabin and engine room stores, cordage required for ordinary ship's purposes mooring alongside in harbor, and all fumigation expenses. The OWNER'S obligations under this Clause extend to cover all liabilities for consular charges appertaining to the master, officers and crew, customs or import duties arising at any time during the performance of this Charter in relation to the personal effects of the master, officers and crew, and in relation to the stores, provisions and other matters as aforesaid which the OWNER is to provide and/or pay for.
   (b) On delivery the vessel shall be equipped, if appropriate, at the OWNER'S expense with any towing and anchor handling equipment specified in **SCHEDULE A**.

6. **CHARTERER to Provide**
   (a) While the vessel is on hire the CHARTERER shall exercise due diligence to direct the vessel to safe berths and safe locations recognizing the risks inherent with vessel operations in Cook Inlet and surrounding areas, shall provide and pay for all berthing facilities for the vessel, fuel, lubricants, water and water storage, shore



Page 2 of 10

power and connections, garbage and recyclables disposal, dispersants, firefighting foam and transport thereof, port charges, pilotage and boatmen and canal steersmen (whether compulsory or not), launch hire (unless incurred in connection with the OWNER'S business), light dues, tug assistance, canal, dock, harbor, tonnage and other dues and charges, agencies and commissions incurred on the CHARTERER'S business, costs for security or other watchmen, and of quarantine (if occasioned by the ports visited whilst employed under this Charter but not otherwise).

(b) At all times the CHARTERER shall provide and pay for the loading and unloading of cargoes so far as not done by the vessel's crew, all necessary dunnage, uprights and shoring equipment for securing deck cargo, all cordage except as to be provided by the OWNER, all ropes, slings and special runners (including bulk cargo discharge hoses) actually used for loading and discharging, and electrodes used for offshore works, and shall reimburse the OWNER for the actual cost of replacement of special mooring lines to offshore units, wires, nylon spring lines etc. used for offshore works, all hose connections and adaptors, and further, shall refill oxygen/acetylene bottles used for offshore works.

(c) Upon entering into this Charter or in any event no later than the time of delivery of the vessel the CHARTERER shall provide the OWNER with copies of any operational plans or documents which are necessary for the safe and efficient operation of the vessel. All documents received by the OWNER shall be returned to the CHARTERER on redelivery.

(d) The CHARTERER shall pay for customs duties, all permits, import duties (including costs involved in establishing temporary or permanent importation bonds), and clearance expenses, both for the vessel and/or equipment, required for or arising out of this Charter.

(e) The CHARTERER shall pay for any replacement of any anchor handling/towing/lifting wires and accessories which have been placed on board by the OWNER or the CHARTERER, should such equipment be lost, damaged or become unserviceable, other than as a result of normal wear and tear or of the OWNER'S negligence.

7. **Bunkers**

Unless otherwise agreed, the vessel shall be delivered with bunkers and lubricants as on board and redelivered with sufficient bunkers to reach the next bunkering facility. The CHARTERER upon delivery and the OWNER upon redelivery shall take over and pay for the bunkers and lubricants on board at the prices prevailing at the times and ports of delivery and redelivery. The CHARTERER shall be liable for any loss or damage to the OWNER caused by the supply of unsuitable fuels.

8. **Hire and Payments**

(a) Hire. The CHARTERER shall pay Hire for the vessel at the rate set forth in **SCHEDULE A** per day or half day from the time that the vessel is delivered to the CHARTERER until the expiration or earlier termination of this Charter.

(b) Adjustment of Hire. The rate of hire shall be adjusted to reflect documented changes, after the date of entering into the Charter or the date of commencement of employment, whichever is earlier, in the OWNER'S costs arising from changes in the CHARTERER'S requirements, or regulations governing the vessel and/or its crew or this Charter or the application thereof.

(c) Payments. Payments of Hire, bunker invoices and disbursements for the CHARTERER'S account shall be remitted within thirty (30) days from the date of receipt of the invoice. OWNER will rely on the vessel's logbook as substantiation of the time that the vessel was used by CHARTERER. Where an invoice is disputed, the CHARTERER shall notify the OWNER before the due date and in any event pay the undisputed portion of the invoice but shall be entitled to withhold payment of the disputed portion provided that such portion is reasonably disputed and the CHARTERER specifies such reason. Interest will be chargeable at the rate of 1 percent per month on such disputed amounts where resolved in favor of the OWNER. Should the OWNER prove the validity of the disputed portion of the invoice, balance of payment due shall be received by the OWNER within thirty (30) days after the dispute is resolved. Should the CHARTERER'S claim be valid, a corrected invoice shall be issued by the OWNER.

(d) (i) Where there is a failure to pay Hire by the due date, the OWNER shall notify the CHARTERER in writing of such failure and further, if reasonable under the circumstances of the vessel's employment, may also suspend the performance of any or all of its obligations under this Charter until such time as all the Hire due to the OWNER under the Charter has been received by the OWNER. Throughout any period of suspended performance under this Clause, the Vessel is to be and shall remain on Hire. The OWNER'S right to suspend performance under this Clause shall be without prejudice to any other rights they may have under this Charter.



(ii) Where the OWNER chooses not to exercise any of the rights afforded to them by this Clause in respect of any particular late payment of Hire, or a series of late payments of Hire, this shall not be construed as a waiver of the OWNER'S right either to suspend performance under Clause 8(d)(i) in respect of any subsequent late payment under this Charter.

(iii) The CHARTERER shall indemnify the OWNER in respect of any liabilities incurred by the OWNER under the Bill of Lading or any other contract of carriage as a consequence of the OWNER'S proper suspension of and/or withdrawal from any or all of its obligations under this Charter.

## 9. Suspension of Hire

(a) If as a result of any deficiency of crew or of the OWNER'S stores, strike of master, officers and crew, breakdown of machinery, damage to hull or other accidents to the vessel, the vessel is prevented from working, no Hire shall be payable in respect of any time lost and any Hire paid in advance shall be adjusted accordingly provided always however that Hire shall not cease in the event of the vessel being prevented from working as aforesaid as a result of:

(i) quarantine or risk of quarantine unless caused by the master, officers or crew having communication with the shore at any infected area not in connection with the employment of the vessel without the consent or the instructions of the CHARTERER;

(ii) deviation from her duties set forth in this Charter or exposure to abnormal risks at the request of the CHARTERER;

(iii) detention in consequence of being driven into port or to anchorage through stress of weather or trading to shallow harbors or to river or ports with bars or suffering an accident to her cargo, when the expenses resulting from such detention shall be for the CHARTERER'S account howsoever incurred;

(iv) detention or damage by ice;

(v) any act or omission of the CHARTERER, its servants or agents.

(b) Maintenance and Drydocking. Notwithstanding Clause 9(a) the CHARTERER shall grant the OWNER a maximum of 24 hours on hire, which shall be cumulative, per month or pro rata for part of a month from the commencement of this Charter for maintenance and repairs including drydocking (hereinafter referred to as "maintenance allowance"). The vessel shall be drydocked at regular intervals. The CHARTERER shall place the vessel at the OWNER'S disposal at a port (to be nominated by the OWNER at a later date) having facilities suitable to the OWNER for the purpose of such drydocking. During reasonable voyage time taken in transits between such port and Area of Operation (as defined in Clause 3) the vessel shall be on hire and such time shall not be counted against the accumulated maintenance allowance. Hire shall be suspended during any time taken in maintenance repairs and drydocking in excess of the accumulated maintenance allowance. As soon as reasonably available after commencement of the Charter, the OWNER agrees to furnish the CHARTERER with the OWNER'S proposed drydocking schedule and the CHARTERER agree to make every reasonable effort to assist the OWNER in adhering to such predetermined drydocking schedule for the vessel.

## 10. Liabilities and Indemnities

(a) OWNER. Notwithstanding anything else contained in this Charter excepting Clauses 6(b) and (e), 7, 8(d)(iii), 10(d), 11, 16 and 17, the CHARTERER shall not be responsible for injury or death of any of the OWNER'S employees, port agents, contractors, subcontractors and vendors, agents, officers or invitees arising out of or in any way connected with the performance of this Charter, unless such injury or death is caused by the negligence, gross negligence or willful misconduct of the CHARTERER; and the OWNER shall indemnify, protect, defend and hold harmless the CHARTERER from any and against all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of or in connection with such injury or death, unless caused by the negligence, gross negligence or willful misconduct of the CHARTERER.

(b) CHARTERER. Notwithstanding anything else contained in this Charter excepting Clauses 12 and 16, the OWNER and its Members shall not be responsible for loss of, damage to, or any liability arising out of anything towed by the Vessel, any cargo laden upon or carried by the Vessel or her tow, the property of the CHARTERER, whether owned or chartered, including its Offshore Units, or for injury or death of any of the CHARTERER'S employees, port agents, contractors, subcontractors and vendors, agents, officers or invitees, or anyone on board anything towed by the Vessel, arising out of or in any way connected with the performance of this Charter, unless such loss, damage, liability, injury or death is caused by the gross negligence or willful misconduct of the OWNER; and the CHARTERER shall indemnify, protect, defend and hold harmless the OWNER and its Members from any and against all claims, costs, expenses, actions,



proceedings, suits, demands, and liabilities whatsoever arising out of or in connection with such loss, damage, liability, personal injury or death unless caused by the gross negligence or willful misconduct of the OWNER.

(c) Consequential Damages. Neither party shall be liable to the other party for any consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Charter, and each party shall protect, defend and indemnify the other from and against all such claims. "Consequential Damages" shall include, but not be limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance, whether or not foreseeable at the date of this Charter.

(d) Limitations. Nothing contained in this Charter shall be construed or held to deprive the OWNER or the CHARTERER, as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Charter shall create any right to limit liability. Where the OWNER or the CHARTERER may seek an indemnity under the provisions of this Charter or against each other in respect of a claim brought by a third party, the OWNER or the CHARTERER shall seek to limit their liability against such third party.

(e) Himalaya Clause.
(i) All exceptions, exemptions, defenses, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter or by any applicable statute, rule or regulation for the benefit of the CHARTERER shall also apply to and be for the benefit of the CHARTERER'S parent, affiliated, related and subsidiary companies; the CHARTERER'S contractors, sub-contractors, co-venturers and customers (having a contractual relationship with the CHARTERER, always with respect to the job or project on which the Vessel is employed); the CHARTERER'S respective employees and their respective underwriters.
(ii) All exceptions, exemptions, defenses, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter or by any applicable statute, rule or regulation for the benefit of the OWNER shall also apply to and be for the benefit of the OWNER'S Members, affiliated, related and subsidiary companies, the OWNER'S contractors, sub-contractors, the Vessel, its Master, Officers and Crew, its registered owner, its operator, its demise charterer(s), their respective employees and their respective underwriters.
(iii) The OWNER or the CHARTERER shall be deemed to be acting as agent or trustee of and for the benefit of all such persons and parties set forth above, but only for the limited purpose of contracting for the extension of such benefits to such persons and parties.

(f) Hazardous or Noxious Substances. Notwithstanding any other provision of this Charter to the contrary, the CHARTERER shall always be responsible for any losses, damages or liabilities suffered by the OWNER, by the CHARTERER, or by third parties, with respect to the Vessel or other property, personal injury or death, pollution or otherwise, which losses, damages or liabilities are caused, directly or indirectly, as a result of the Vessel's carriage of any hazardous or noxious substances in whatever form as ordered by the CHARTERER, and the CHARTERER shall defend, indemnify the OWNER and hold the OWNER harmless for any expense, loss or liability whatsoever or howsoever arising with respect to the carriage of hazardous or noxious substances except where such damage, loss or liability arises from the gross negligence or willful misconduct of the OWNER.

## 11. Pollution

The CHARTERER shall be liable for and agree to indemnify, defend and hold harmless the OWNER from all claims, costs, expenses, actions, proceedings, suits, demands, liabilities, loss or damage (a "Claim") whatsoever arising out of or resulting from any other actual or threatened pollution damage, even where caused wholly or partially by the act, neglect or default of the OWNER, its employees, contractors or sub-contractors or by the unseaworthiness of the vessel; provided, however, that this assumption of liability shall not apply and the indemnity shall not extend to cover any Claim to the extent the related pollution damage was directly or indirectly caused, in whole or in part, by the gross negligence or willful misconduct of OWNER.

## 12. Wreck Removal

If the vessel becomes a wreck and is an obstruction to navigation and has to be removed by order of any lawful authority having jurisdiction over the area where the vessel is placed or as a result of compulsory law, the OWNER shall be liable for any and all expenses in connection with the raising, removal, destruction, lighting or marking of the vessel.

Case 3:21-cv-00194-SLG   Document 1-1   Filed 08/23/21   Page 9 of 18

## 13. Insurance

(a) Owner, at its sole cost and expense (including the cost of all deductibles), shall procure and maintain in force during the term of this Agreement the following insurance coverages which shall apply independently of indemnity obligations which may be contained under Repair Service Orders, Purchase Orders or Master Service Agreement.

1. Hull and Machinery subject to the American Institute Hull Clauses or equivalent, in an amount not less than the full value of the vessel;

2. Protection & Indemnity Insurance pursuant to Form SP-23 with minimum limits of $1 million per occurrence with tower's liability coverage, cargo legal liability, collision liability (if not covered elsewhere), and liability for seepage, pollution, containment and cleanup, with extensions for marine contractual liability, removal of wreck, etc.

3. Vessel Pollution Liability to include but not be limited to (1) sudden and accidental releases, (2) gradual releases, and (3) clean-up costs, with limits of liability not less than $1 million per occurrence, and any other public liability or coverage required by Federal, State, or local regulatory laws or guidelines.

4. Commercial General Liability insurance, on a per occurrence basis, endorsed to cover premises, operations, products/completed operations, personal injury and contractual liability; watercraft exclusions deleted and "in rem" coverage as may be applicable, with limits of liability not less than $1 million any one accident or occurrence.

5. Workers Compensation insurance as required by law for all employees, agents and subcontractors; and, Marine Employer's Liability insurance with limits of liability not less than $1 million each accident. If there is an exposure of injury or illness under the U.S. Longshore and Harbor Workers Compensation Act (including the Outer Continental Shelf Lands Act), the Jones Act, Admiralty Act, Death on the High Seas Act and/or other statutes applicable to maritime employees, Contractor agrees to maintain insurance for such injuries or illnesses, and to provide evidence of such insurance as applicable if coverage is not provided elsewhere.

6. Umbrella or Bumbershoot liability excess of the collision/towers liability and protection and indemnity insurance and pollution liability if written separately in the amount of $24,000,000.

(b) Charterer, shall, at its sole expense, procure and maintain such of the following insurances for the duration of the charter term:

1. all risk cargo insurance to the full delivered value of all cargoes plus freight and insurance;

2. full form charterer's legal liability insurance, specifically extended to insure, Charterer's obligations under this charter, with minimum limits of $1 million per occurrence; and

3. standard Workers Compensation and Marine Employers Liability insurance, upon all employees of Charterer and Charterer's subcontractors, extended to include coverage under the Longshore and Alaska Workers Compensation Acts, with statutory limits for workers compensation and limits of $1 million per occurrence for employers liability.

4. Umbrella or Bumbershoot liability excess of the charterer's legal liability, cargo, Workers Compensation and Marine Employers Liability in the amount of $4 million.

(c) Conditions.

1. Each party shall provide the other with certificates of insurance and, upon request, copies of policies, confirming that the foregoing insurances have been procured and maintained. All policies shall be upon forms and with underwriting security acceptable to the other party.

2. There shall be no material changes in any insurance identified during the charter term without the written assent of the other party. Each policy shall be endorsed to require ten (10) days advance notice to the other party of any material change or cancellation.

Case 3:21-cv-00194-SLG   Document 1-1   Filed 08/23/21   Page 10 of 18

3.  All policy deductibles shall be the responsibility of the party required to procure that insurance, subject to the liability allocation set forth in Clauses 10 and 11, above.

4.  Each insurance shall waive subrogation as to the non-procuring party, subject to the liability allocation set forth in Clauses 10 and 11, above.

5.  The parties shall rely upon the foregoing insurances to address loss, damage, claim, liability and/or suit relating to this charter and/or performance hereunder, and shall promptly submit all such matters to the applicable insurance. Any insurances required of Charterer shall be primary to Owner's insurances.

6.  Each party shall indemnify and hold harmless (including costs and legal fees) the other from any policy deductible or premium obligation allocated to it, from the failure to provide an insurance required, from the failure (for any reason) of any insurance and/or from any other breach of the foregoing insurance section. This indemnification agreement shall cover, as well, any breach of warranty or other policy condition.

### 14. Substitute Vessel and Equipment

The OWNER shall be entitled at any time during the Charter Period, to provide a substitute vessel and equipment, subject to the CHARTERER'S prior approval which shall not be unreasonably withheld.

### 15. Ice Clause

(a) The vessel shall not be obliged to force ice but, subject to the OWNER'S prior approval having due regard to its size, construction and class, may follow icebreakers.

(b) The vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights, lightships, markers or buoys have been or are about to be withdrawn by reason of ice, nor where on account of ice there is, in the Master's sole discretion, a risk that, in the ordinary course of events, the Vessel will not be able safely to enter and remain at the port or area or to depart after completion of loading or discharging. If, on account of ice, the Master in his sole discretion considers it unsafe to proceed to, enter or remain at the place of loading or discharging for fear of the Vessel being frozen in and/or damaged, he shall be at liberty to sail to the nearest ice-free and safe place and there await the CHARTERER'S instructions.

(c) Any delay or deviation caused by or resulting from ice shall be for the CHARTERER'S account and the Vessel shall remain on-hire.

(d) Any additional premiums and/or calls required by the Vessel's underwriters due to the Vessel entering or remaining in any icebound port or area shall be for the CHARTERER'S account.

### 16. General Average and New Jason Clause

General Average shall be adjusted and settled in New York, according to York-Antwerp Rules, 1994. Hire shall not contribute to General Average. Should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply: "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, loss or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the Owners before delivery".

### 17. Both-to-Blame Collision Clause

If the vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the OWNER in the navigation or the management of the Vessel, the CHARTERER will indemnify the OWNER against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability arises from or relates to loss of or damage to any goods carried on the vessel under this Charter, or any claim whatsoever of the owners of such goods, paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the vessel or the OWNER. The foregoing provisions shall also apply where the owners, operators or those



in charge of any ship or ships or objects other than or in addition to the colliding ships or objects are at fault in respect of a collision or contact.

### 18. Health and Safety

The OWNER shall comply with and adhere to all applicable national and local regulations pertaining to health and safety, and such CHARTERER'S instructions as may be appended hereto.

### 19. Drugs and Alcohol Policy

The OWNER undertakes that it has, and shall maintain for the duration of this Charter, a policy on Drugs and Alcohol Abuse applicable to the Vessel (the "D & A Policy") that meets or exceeds the standards in the OCIMF Guidelines for the Control of Drugs and Alcohol Onboard Ship 1995 as amended from time to time. The OWNER shall exercise due diligence to ensure that the D & A Policy is understood and complied with on and about the Vessel. An actual impairment, shall not in and itself mean that the OWNER has failed to exercise due diligence.

### 20. Taxes

Within the day rate the OWNER shall be responsible for taxes on vessel hire and the CHARTERER shall be responsible for all other taxes.

### 21. Early Termination

The CHARTERER may terminate this Charter at any time by giving thirty (30) days' written notice to the OWNER. Upon receipt of the notice and expiration of the notice period, CHARTERER shall pay Hire or other payments due under this Charter up to the time of termination. The CHARTERER may terminate a Spot Charter at any time by giving a minimum of one day (24 hours) written notice to the OWNER. If a Spot Charter is terminated early without the one day (24 hour) termination notice, the CHARTERER may be charged the cancelled charter rate as a penalty for late or no termination notification.

### 22. Force Majeure

Neither party shall be liable for any loss, damage or delay due to any of the following force majeure events and/or conditions to the extent the party invoking force majeure is prevented or hindered from performing any or all of their obligations under this Charter, provided they have made all reasonable efforts to avoid, minimize or prevent the effect of such events and/or conditions:
(a) acts of God;
(b) any Government requisition, control, intervention, requirement or interference;
(c) any circumstances arising out of war, threatened act of war or warlike operations, acts of terrorism, sabotage or piracy, or the consequences thereof;
(d) riots, civil commotion, blockades or embargoes;
(e) epidemics;
(f) earthquakes, landslides, floods or other extraordinary weather conditions;
(g) strikes, lockouts or other industrial action, unless limited to the employees of the party seeking to invoke force majeure;
(h) fire, accident, explosion except where caused by negligence of the party seeking to invoke force majeure; and
(i) any other similar cause beyond the reasonable control of either party.
(j) The party seeking to invoke force majeure shall notify the other party in writing within three (3) business days of the occurrence of any such event/condition.

### 23. Confidentiality

All information or data provided or obtained in connection with the performance of this Charter is and shall remain confidential and not be disclosed without the prior written consent of the other party. The parties shall use their best efforts to ensure that such information shall not be disclosed to any third party by any of their contractors, sub-contractors, employees and agents. This Clause shall not apply to any information or data that has already been published or is in the public domain or to the extent disclosure of such information is required by law. All information and data provided by a party is and shall remain the property of that party.



## 24. Dispute Resolution

(a) This Charter shall be governed by the General Maritime Law of the United States, excluding any conflicts of laws principles that would direct the substantive law of another jurisdiction to apply, and any dispute arising out of or in connection with this Charter shall be referred to arbitration in Anchorage, Alaska. The arbitration proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc. ("SMA") before a sole arbitrator to be jointly appointed by OWNER and CHARTERER. Where agreement cannot be reached on the appointment of a sole arbitrator, the arbitrator shall be appointed by the President of the SMA. An award made pursuant to this provision may include costs, including a reasonable allowance for attorneys' fees. The award of the sole arbitrator shall be final and binding on both parties and judgment may be entered upon any award made hereunder in any Court of competent jurisdiction. Nothing in this provision shall bar parties from agreeing to a different venue at the arbitrators' request or upon their mutual agreement.

(b) In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the SMA current at the time when the arbitration proceedings are commenced.

## 25. Right of First Call

This Charter is subject to the CISPRI Services and Right of First Call Agreement dated December 15, 2015 between CISPRI and Cook Inlet Spill Prevention & Response, Incorporated ("INC"). CHARTERER hereby agrees, upon written notice by OWNER, to immediately direct the return of the vessel and equipment defined in Schedule A to the redelivery port specified by CISPRI and offload remaining cargo (at CHARTERER'S expense) if the CISPRI Services and Right of First Call Agreement is invoked. The invocation of the Right of First Call shall have the effect of terminating the Spot Charter and, notwithstanding Clause 8 or any other provision of this Agreement, hire shall cease upon receipt of such written notice. OWNER shall, in good faith, seek to locate a suitable substitute vessel to complete the Charter.

## 26. Vessel Access Protocol

a. Once a Spot Charter Agreement has been signed, CHARTERER has the highest priority for use of the Vessel for the term of the Spot Charter Agreement, other than for oil spill or medical emergencies.

b. In the event of conflicting requests for use of the Vessels, the following ranking system will be used in prioritizing the use of the Vessel from highest priority to lowest priority:
   i. Emergencies, including safety of life and similar medical emergencies;
   ii. Spill prevention and response services;
   iii. Drift River tank ship support;
   iv. Mitigation of situations which could result in a material loss of revenue by a CISPRI member;
   v. Charters to Members for off-shore supply and support services; and
   vi. Charters to Non-Member for off-shore supply and support services.

CISPRI and CHARTERER will endeavor to resolve any scheduling conflicts in accordance with the ranking system set out above. However, any decision that CISPRI makes regarding conflicting use of the Vessel shall be final and not subject to challenge absent evidence of willful misconduct on the part of CISPRI.

## 27. Severability:

If any provision of this Charter is found to be unlawful or otherwise unenforceable, then such provision shall be deemed to be severed from this Charter and every other provision of this Charter shall remain in full force and effect.

## 28. No Assignment:

This Charter may not be assigned under any circumstances.

## 29. Entire Agreement:

This Charter, including any Schedules referenced herein, constitute the full and complete understanding between the parties and no statement, oral or written, made prior to or at the signing hereof, shall vary, modify



Case 3:21-cv-00194-SLG   Document 1-1   Filed 08/23/21   Page 13 of 18

or be used or interpret the written terms and conditions hereof. Any modification of the provisions hereof shall be by written agreement executed by authorized representatives of the parties.

DATED this 31st day of December, 2015.

| OWNER: | CHARTERER: |
|---|---|
| CISPRI SERVICES LLC | FURIE OPERATING ALASKA LLC |
| *[signature]* | *[signature]* |
| SIGNATURE | SIGNATURE |
| TODD D. PAXTON, GENERAL MANAGER | DAVID W. ELDER, CHIEF FINANCIAL OFFICER |
| PRINTED NAME & TITLE | PRINTED NAME & TITLE |

**Exhibit 2**

# SCHEDULE A
## [Charterer Info.]
## Spot Charter Agreement

**SOLE USAGE OF CHARTERER ONLY**

| **Owner** | **Operator** | **Charterer** |
|---|---|---|
| CISPRI Services, LLC (CISPRI)<br>51377 Kenai Spur Hwy/<br>Kenai, AK 99611<br><br>Todd Paxton, General Manager<br>T: (907) 776-5129<br>F: (907) 776-2190<br>C: (907) 398-1901<br>Email: tpaxton@cispri.org | CISPRI Services, LLC (CISPRI)<br>51377 Kenai Spur Hwy.<br>Kenai, AK 99611<br><br>Kevin Moomey, Vessel Coordinator<br>Vessel Hotline: (907)-776-7499<br><br>Email: logistics@cispri.org | [Charterer info] |

| **Identification of Vessel and Equipment** | **Underlying Charter** |
|---|---|
| NAME : M/V Endeavor<br>OFFICIAL NO. : 697051<br>DIMENSIONS : 179'-6" Length; 11'-2" Depth; 40' Beam<br>TYPE : OSV | CISPRI Services Uniform Time Charter Party for Offshore Supply and Support Services, dated _____ |

| **Charter Term** | **Type of Hire and Charges** |
|---|---|
| DELIVERY PORT/PLACE : NIKISKI, AK<br>DELIVERY DATE/TIME    XX/XX/XX;    0000 Hrs.<br>REDELIVERY PORT/PLACE : NIKISKI, AK<br>REDELIVERY DATE/TIME   : XX/XX/XX;    0000 Hrs. | The Vessel's charter rate shall be $_____ per day and is payable directly to CISPRI. Charterer will be responsible for all fuel, lubes, and all other associated costs. Day rate reflects crewing to support either 12 or 24 hour operations as indicated below, and will increase by 2.5% per calendar year. Any extra crew or equipment shall be for Charterer's account.<br><br>TYPE of HIRE (check one):<br>☐ OSV - HALF DAY<br><br>☐ OSV/ SPILL RESPONSE – FULL DAY<br><br>☐ TOW/ANCHOR HANDLING – FULL DAY |

1. CISPRI and Charterer agree that Charterer shall charter the Vessel identified herein from CISPRI under the same terms and conditions agreed between CISPRI and Charterer in the CISPRI SERVICES UNIFORM TIME CHARTER PARTY FOR OFF-SHORE SUPPLY AND SUPPORT SERVICES.

2. CISPRI shall remain responsible for the Contingency Plan required in the Underlying Charter. Charterer is responsible for assuming control of any oil spills which occur while the Vessel is under its control. Charterer will also immediately notify CISPRI of such spills if they occur. All costs associated with the spill response, including containment, recovery and restoration shall be for the account of the Charterer.

3. This Spot Charter, the underlying CISPRI SERVICES UNIFORM TIME CHARTER PARTY FOR OFF-SHORE SUPPLY AND SUPPORT SERVICES, and any written and signed amendment(s) thereto constitute the entire agreement between the parties regarding the charter of the Vessel and Equipment (if any), expressly replacing, superseding and negating any prior or contemporaneous agreements or understandings, written or oral. In the event of any inconsistency between the terms of these agreements, the terms of the CISPRI UNIFORM TIME CHARTER PARTY shall prevail. This Charter may not be modified except through a writing signed by both Charterer and CISPRI. This Charter may be executed in counterparts, all of which together shall constitute a single agreement. A facsimile or emailed signature to this Charter shall be deemed equivalent to an original.

**OPERATOR:**　　　　　　　　　　　　　　　　　　　　**CHARTERER:**
CISPRI SERVICES, LLC

_____　　　　　　　　_____
SIGNATURE　　　　　　　　　　　　　　　　　　　　SIGNATURE

KEVIN MOOMEY, VESSEL COORDINATOR　　　　　_____
PRINTED NAME & TITLE　　　　　　　　　　　　　PRINTED NAME & TITLE

_____　　　　　　　　_____
DATE　　　　　　　　　　　　　　　　　　　　　　DATE

1

**Exhibit 3**

# Perseverance
## Spot Charter Agreement

SOLE USAGE OF CHARTERER ONLY

| Owner | Operator | Charterer |
|---|---|---|
| CISPRI Services, LLC (CISPRI)<br>51377 Kenai Spur Hwy/<br>Kenai, AK 99611<br><br>Todd Paxton, General Manager<br>T: (907) 776-5129<br>F: (907) 776-2190<br>C: (907) 398-1901<br>Email: tpaxton@cispri.org | CISPRI Services, LLC (CISPRI)<br>51377 Kenai Spur Hwy.<br>Kenai, AK 99611<br><br>Kevin Moomey, Vessel Coordinator<br>Vessel Hotline: (907)-776-7499<br><br>Email: logistics@cispri.org | Furie Operating Alaska, LLC<br>100 Enterprise Ave.<br>League City, TX 77573<br><br>David Elder (CFO)<br>281-957-9812<br>d.elder@furiealasks.com<br><br>Kenny Billings (Installation Coordinator)<br>337-459-1790<br>k.billings@furiealaska.com |

| Identification of Vessel | | Underlying Charter |
|---|---|---|
| NAME<br>OFFICIAL NO.<br>DIMENSIONS<br>TYPE | : M/V Perseverance<br>: 580853<br>: 207' Length; 17' Depth; 40' Beam<br>: OSV | Shared Service Sublease Agreement as dated with each respective Member |

| Charter Term | Hire and Charges |
|---|---|
| DELIVERY PORT/PLACE : NIKISKI, AK<br>DELIVERY DATE/TIME : 01/08/2016, 0000 Hrs.<br>REDELIVERY PORT/PLACE : NIKISKI, AK<br>REDELIVERY DATE/TIME : 01/08/2016: 2400 Hrs. | The Vessel's charter rate shall be $8,939 per day and is payable directly to CISPRI. Charterer will be responsible for all fuel, lubes, and any other CISPRI costs. Day rate includes 8-man crew, and will increase by 2.5% annually per sublease agreement. |

1. CISPRI and Charterer agree that Charterer shall charter the Vessel identified herein from CISPRI under the same terms and conditions agreed between CISPRI and Charterer in the Underlying Charter, as identified herein. 2.

2. CISPRI shall remain responsible for the Contingency Plan required in the Underlying Charter. Charterer is responsible for assuming initial control of any oil spills which occur while the Vessel is under their control. Charterer will also immediately notify CISPRI of such spill and to the extent possible, shall promptly obey all directions from CISPRI concerning spill response and containment. All costs associated with the spill response, including containment, recovery and restoration shall be for the account of the Charterer.

3. This Charter, the Underlying Charter, and any amendment(s) thereto constitutes the entire agreement between the parties regarding the charter of the Vessel, expressly replacing, superseding and negating any prior or contemporaneous agreements or understandings, written or oral. In the event of any inconsistency between the terms of these agreements, the terms of the Shared Service Agreement shall prevail. This Charter may not be modified except through a writing signed by both Charterer and CISPRI. This Charter may be executed in counterparts, all of which together shall constitute a single agreement. A facsimile signature to this Charter shall be deemed equivalent to an original.

4. The intended use of the M/V Perseverance in Furie Alaska's offshore platform installation project including in sub-sea pipeline installation and in anchor handling (the "Furie Platform Project") adds a significant element of additional risk to the activities of M/V Perseverance. In light of this added exposure, CISPRI would like Furie Alaska to confirm that CISPRI and its vessel Manager will be fully indemnified and held harmless by Furie Alaska for (a) all liabilities, claims, losses and damages etc. and (b) all pollution related (spill and clean-up) liabilities and costs, arising out of or in any way related to the activities of the M/V Perseverance on the Furie Platform Project. This indemnity will apply without regard to any negligence or fault on the part of the M/V Perseverance, its crew and its owners and operators.

OPERATOR:
CISPRI

*[signature: Kevin Moomey]*

SIGNATURE

KEVIN MOOMEY / VESSEL COORDINATOR
PRINTED NAME & TITLE

JANUARY 5, 2016
DATE

CHARTERER:

*[signature]*

SIGNATURE

Richey Monceaux  Prod. Supt.
PRINTED NAME & TITLE

1/5/16
DATE